In re Oscar RESNICK, Janice
Resnick, Debtors.

**WORCESTER COUNTY NATIONAL
BANK, Plaintiff,**

v.

Oscar RESNICK, Janice Resnick,
Defendants.

Bankruptcy No. 80–0003–G.
Adv. No. 4–80–0009.

United States Bankruptcy Court,
D. Massachusetts.

March 25, 1981.

Carl Aframe, Worcester, Mass., for plaintiff.

Steven Kressler, Worcester, Mass., for defendants.

## MEMORANDUM AND ORDER ON COMPLAINT TO VACATE STAY

PAUL W. GLENNON, Bankruptcy Judge.

This case revolves around the question of whether a certain clause in a second mortgage agreement is effective in bringing within its ambit subsequent loans made to the debtor. This type of clause is commonly known as a "dragnet" clause, and its effect is much like that of after-acquired property or future advance clauses in UCC transactions in that it subjects certain loans which otherwise appear to be unsecured to an earlier mortgage.

The debtors are a husband and wife who have lived in the same home in Worcester, Massachusetts for more than 20 years. In September, 1977 they sought to and did refinance the mortgage on their home with the Worcester County National Bank (the "Bank"). On September 21, 1977, the debtors executed a valid first mortgage to the Bank in the amount of $26,400. Six days later, on September 27, 1977, they executed a valid second mortgage to the Bank for $17,000, bringing their total indebtedness to approximately $43,000. So far as the court is aware, and the record so indicates, the debtors have never been in default on the original payments called for in those two mortgages. All payments have been kept current up through and including these bankruptcy proceedings.

On January 2, 1980, the debtors filed the within petition in bankruptcy under Chapter 7 of the Bankruptcy Code. The complaint to vacate stay was filed on behalf of the Bank on February 14, 1980. The debtors have answered and counterclaimed for damages. This decision deals only with the Bank's request for relief from stay, and does not address the issue of the debtors' counterclaim. That question will have to be decided after further hearing.

The applicable section of the Code is Section 362(d), which provides in pertinent part,

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay...
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have equity in such property; and
>
> (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d).

Subsection (d) requires the court to grant relief from the automatic stay of Section 362(a) *for cause.* The lack of adequate protection is one cause for relief, but not the only one. H.R. 95–595 (95th Cong., 1st Sess. (1977) 34 3–4, U.S.Code Cong. & Admin.News 1978, 5963. In the case at bar, we are concerned with subsection (d)(2). The Bank, therefore, has the burden of proof on the issue of the debtors' equity in the property, and the debtors have the burden on all other issues. 11 U.S.C. § 362(g).

The fact questions to be determined are twofold: 1. What amount is owing to the Bank under its secured position? 2. What is the value of the debtors' home for purposes of determining the question of whether there is any equity in the debtors? The Bank has alleged that the actual loan balance is somewhere in excess of $50,000. This is attributable to the amounts loaned in 1977 on the two mortgages, plus two personal loans made to the debtors in 1979, which the Bank alleges were covered by the second mortgage dated September 27, 1977. The debtors argue that the two personal loans were unsecured debts, are not covered by the second mortgage, and that as a result, the loan balance secured by the mortgage is closer to $38,000. The dispute is significant because the *highest* appraisal figure for the home in the court's possession is $49,500 which, under the Bank's theory, leaves no possible equity in the debtors. If

the debtors' theory is accepted, the court must then determine the reasonable value of the property in order to decide the question of equity.

The matter was brought on for hearing, and after extensive testimony spanning two days, the following facts are apparent. As of the filing date of the Chapter 7 petition, the indebtedness to the Bank on its first two mortgage notes was $40,067.78. That amount has been reduced somewhat because the debtors have been making regular monthly payments on their mortgage obligation. There are also real estate taxes due on the property in the amount of $3,931.04, although it appears that post-filing taxes have increased that amount to approximately $5000. As I said, however, the debtors have always paid their original mortgage indebtedness currently, both before and after the filing. The Bank is seeking relief from stay because it feels that certain personal loans given to Dr. Resnick are also secured by its mortgage, and that those loans are in default, leaving the Bank in the position of being undersecured. The two loans in question were for $6,000 and $5350, respectively. They are both evidenced by notes, identical in form, except as to the amounts and the interest rates. The first note is dated January 8, 1978, and is in the principal amount of $6000 with interest at a variable rate of 2½% over the Bank's prime rate. The opening annual percentage rate was 14.25%. The second note is dated February 5, 1979 in the principal amount of $5350, with a fixed rate of 14.98%. Both notes are headed at the top, in bold print, "UNSECURED PERSONAL PROMISSORY NOTE". The mortgage note, by which the Bank claims to have a secured position on the two personal loans mentioned above, is a note dated September 27, 1977, in the principal amount of $17,000 at a variable rate of 2% above prime. The note contains language found in most standardized forms of its kind, but it appears that this note was typed specially for the particular transaction. It is merely labeled "PROMISSORY NOTE" and contains no letterhead. However, it follows very closely the form used for the personal loans, except that it con-

tains additional language regarding payment, default, application of payments to principal and interest, notice, etc. The question before the court involves the validity of the second-to-last paragraph in that mortgage note, which states,

Any deposits or other sums at any time credited by or due from the holder to the maker hereof and any securities or other property of the maker hereof in the possession of the holder may at all times be held and treated as collateral security for the payment of this Note *and of any and all other liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of said maker to the holder....* (Emphasis added.)

It is by this last clause in its mortgage note of 1977 that the Bank seeks to subject to the mortgage the $11,350 in personal loans to the debtors. This type of clause is commonly referred to as a "dragnet" clause. There was extensive testimony by both the Bank's representative and Dr. Resnick about the circumstances behind the granting of the mortgage and the need for such a clause. The testimony of the Bank's loan officer was that Dr. Resnick had informed him of substantial tax liabilities which he was unable to pay, and the possibility that future loans might be needed. In order to avoid the expense and delay of future rewriting of the mortgage, according to the loan officer, this clause was inserted so that the Bank could make personal loans to Dr. Resnick that would be properly collateralized. Dr. Resnick vehemently denies having represented any future need for loans. In fact, he said that at the time of the second mortgage transaction he felt that he would be "rolling in money" in 1978 and 1979.

This discrepancy in testimony of each witness can be clarified by certain observations about the evidence introduced in this case. The Bank, prior to taking its mortgages on the property, had its own appraisal made of the value of this residence. That appraisal, dated July 20, 1977, was in the amount of $33,000. Against that prop-

erty, the Bank loaned $43,000 to the debtors in September of 1977. Therefore, it is easy to see that the Bank was undersecured from the outset. There was no testimony or evidence to suggest that the Bank has ever looked to any other property or account for security on its first two mortgage loans to the debtors. If, as the debtors stipulate, the mortgage balances exceeded $40,000 on the date of the filing, and if, as has been shown, the debtors remained current in their payments to the Bank, it can be concluded that the mortgage indebtedness at the time the two personal loans were made was in excess of that amount, and that the Bank had every reason to suspect, based on its own appraisal, that it was under-collateralized even before it made the two personal loans. This tends to lead me to the conclusion that in making the loans of January 8 and February 5, 1979 to the debtors, the Bank was not looking to the debtors' residence as security for the loans. This is supported by the fact that the two personal loans are evidenced by notes which are clearly identified as *Unsecured Personal Promissory Notes*, and by the testimony of Dr. Resnick that at the time of the making of those notes, he was not told that the loans would be subject to the second mortgage on his home. Therefore, I would and do hereby find, that the two loans evidenced by notes dated January 8, 1979 and February 5, 1979, were made by the Bank to the debtors without the expectation that the Bank would satisfy itself in the event of default out of its mortgage on the debtors' home.

I find the case of *In re Albanese*, No. 79–0448–HL, Bank, Ct.D.Mass.1979 (B.J. Lavien), to be almost directly on point, both as to the facts and the law. In reference to a similar "dragnet" clause, my distinguished colleague Judge Harold Lavien noted that the creditor used "entirely different printed notes for their secured mortgage loan and the two unsecured loans". Further, he pointed out that each of the two unsecured notes had a space entitled "collateral" in which the creditor had typed "none", and that the unsecured notes carried a markedly higher interest rate

than the secured mortgage note, indicating that the creditor was not relying at the time of the loans on the mortgage as collateral. Finally, he observed that there was nothing in the unsecured notes to alert the debtors to the creditors' intention to rely on the mortgage as collateral nor did they communicate that intention orally. The facts of that case are so similar to the case at bar that I feel the reasoning of that decision, with which I strongly concur, should be applied in toto to the case at bar. I find nothing in the Bank's arguments in brief that the *Albanese* case is in any way materially distinguishable from the case before me now. Therefore, I would apply the reasoning of *Albanese* to this case.

■■■ *Albanese* relied on the recent Massachusetts decision of *Financial Acceptance Corporation v. Garvey*, 6 Mass.App. 610, 380 N.E.2d 1332, cert. denied, 1978 Mass. Adv.Sh. 291 (S.J.C.1978), for this state's interpretation of dragnet clauses. The standard set forth for construing such clauses is whether it was the intent of the parties in view of the particular circumstances and the language employed in the mortgage to include future loans within the mortgage. It seems apparent from my observations above that the parties here did not intend that these Unsecured Personal Promissory Notes would be part of the Bank's second mortgage position. Based on the evidence, the Bank was already undersecured at the time of these loans and gave no indication to the debtors that they intended to rely upon the mortgage as security for the two unsecured notes. The notes themselves make no reference to the mortgage note, nor do they specifically identify the debtors' real property as collateral. Therefore, after careful consideration of all the evidence and testimony, I do hereby find that the two promissory notes captioned Unsecured Personal Promissory Notes, valued jointly at $11,350, were in fact evidence of an unsecured personal obligation of the debtors to the Bank, and were not properly included in the Bank's mortgage balance owed to it by the debtors as of the date of the filing of the

petition. As a result of that finding, I do further find that the amount owed to the Bank by the debtors upon their mortgage obligation as of the date of the filing of the petition in bankruptcy was $40,067.78. Further, the unrebutted testimony of Dr. Resnick indicates that he is current with all mortgage obligations and has remained current with all mortgage obligations since the execution of the mortgages. Finally, since it is now more than one year from the date the Chapter 7 petition was filed, it can be concluded that the mortgage balance is now somewhat less than $40,000.

Turning now to the question of the value of the debtors' home, the Bank has submitted an appraisal dated June 20, 1980 which recites a value of $36,000, which is only $3000 more than the Bank's appraisal made almost 3 years earlier. The debtors have submitted a copy of their Schedules filed with their petition, which lists the value of the property as $40,000. I place little importance on this figure since it is usually arrived at arbitrarily and is often made to conform to the circumstances of the individual debtor. However, the debtors did offer the testimony of two expert real estate appraisers who arrived at respective values for the home of $45,000 and $49,600. It is also important to note that the debtors' appraisals were made according to a market value approach (willing buyer-willing seller), as opposed to the Bank's appraisal, which was arrived at by computing the home's monthly rental value and multiplying that figure by 100. In analyzing the relative appraisals I am impressed by the fact that all three appraisals made special note of the excellent condition of the house and the care with which it is maintained. Further, I am disturbed by the fact that in three years time, the Bank's appraiser felt that the property had only appreciated 9% in value. I don't claim to be an expert in the housing market, but my impression has been that the value of most residential, single family homes has increased at a much rapid pace. This leads me to believe that the Bank's appraisal is somewhat lower than the actual market value of the home. That view is buttressed by the fact that I am skeptical of the reliability of the method used by the Bank to appraise this property, since it has never been shown to be a rental-type of housing unit.

At the same time, however, I am not altogether satisfied that the debtors' appraisals are completely accurate either. I suspect that they are rather high, considering some of the limitations of the property pointed out by the Bank. I have often said that there is no more elusive term in the English vocabulary than the word "value". In this instance, it is extremely difficult to determine with precision exactly what the market value of this particular piece of property might be, but I suspect it falls within a range of $40,000–$45,000. If the Bank is undersecured at all, it is only as a result of the real estate taxes not having been paid. In view of the fact that the debtors have always been current with their mortgage payments, there has been no substantial default on the mortgage note, and that the Bank appears to be nearly, if not totally, secured, I am of the opinion that the Bank's complaint for relief from stay should be dismissed. In support of that conclusion I point out that the burden of proof, and therefore the burden of persuasion, in showing the debtors' lack of equity is upon the Bank. I find no fault with the Bank's effort, in this regard, but feel that they have not proved by a preponderance of the evidence that there is no equity for the debtors in this property. Finally, the fact that Dr. Resnick earns in excess of $40,000 per year, and has always met his mortgage obligations, tends to tip the delicate balance in this case to his favor. As a court of equity, and having found that the $11,000 in personal loans is not covered by the Bank's mortgage, I feel the burden on the Bank, considering all the circumstances, is slightly greater because the property involved is a family residence. In light of all these facts, the complaint should be dismissed.

However, I am concerned that real estate taxes remain unpaid, and therefore, I would require that, beginning May 1, 1981, and the first day of every month thereafter

until this case is closed, the debtor remit $100 to a tax escrow account to be used to pay real estate taxes.

Finally, this court, by this decision, does not impute any willful or knowing deception to the Bank in its dealings with the Resnicks. No evidence or testimony was allowed on that point, and I shall leave for further hearing the question of the debtors' counterclaim against the Bank. An Order shall issue in accordance with this Memorandum.